# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 49136

| | | |
|---|---|---|
| DOUGLAS A. BAGBY, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | Boise, January 2023 Term |
| | ) | |
| v. | ) | Opinion filed: May 22, 2023 |
| | ) | |
| JOSEPH D. DAVIS, HILARY DAVIS, | ) | Melanie Gagnepain, Clerk |
| | ) | |
| Defendants-Respondents. | ) | |
| | ) | |

Appeal from the District Court of the Fifth Judicial District of the State of Idaho, Blaine County. Ned C. Williamson, District Judge.

The decision of the district court is affirmed.

Law Offices of Douglas A. Bagby, Los Angeles, CA, for Appellant pro se. Douglas A. Bagby argued.

Luboviski, Wygle, Fallowfield & Ritzau, P.A, Ketchum, for Respondent Joseph D. Davis. Stanek Law, PLLC, Hailey, for Respondent Hilary Davis. Benedon & Serlin, LLP, Woodland Hills, CA, for Respondents Joseph D. Davis and Hilary Davis. Mark Schaeffer, *Pro Hac Vice*, argued.

---

ZAHN, Justice.

This appeal arises following a court trial in which Appellant Douglas Bagby argued that a transaction between Respondents Joseph and Hilary Davis was intended to hinder, delay, or defraud Bagby in his efforts to collect on a $5 million judgment against Joseph. The district court concluded that Bagby failed to meet his burden on several causes of action arising under California's version of the Uniform Voidable Transactions Act. Bagby appeals many of the district court's findings and conclusions. For the reasons discussed below, we affirm the district court's judgment dismissing Bagby's claims.

# I. FACTUAL AND PROCEDURAL BACKGROUND

## A. Factual background.

Bagby, a California resident, obtained a default judgment for $5,000,000 against Joseph, a former California lawyer who now resides in Florida. In this action, Bagby seeks to set aside a transaction between Joseph and Hilary in which Joseph transferred his one-half interest in real property located in Ketchum, Idaho, to Hilary. Joseph and Hilary maintain the purpose of the transaction was to settle claims that Hilary had against Joseph, while Bagby asserts the transaction was intended to hinder or delay his ability to collect on his judgment.

### 1. *Joseph's and Hilary's pending dissolution of marriage action.*

Joseph and Hilary were married in 1993. In 2003, the couple separated, but it was not until 2005 that Hilary filed a petition for dissolution of marriage. Bagby, a family law attorney, briefly represented Joseph in the dissolution action. The divorce proceedings continued for many years, and Joseph and Hilary remained legally married at the time of the 2021 trial in this case.

Relevant to this appeal are several claims that Joseph and Hilary asserted in the divorce action. First, Hilary asserted a claim against Joseph for $1,277,717, representing her share of attorney fees for the successful contingency fee cases that Joseph earned between the date of the parties' marriage and their separation. Joseph calculated the amount of these attorney fees by estimating time worked on each case before and after the parties' separation and apportioning the fees earned accordingly.

Hilary also asserted a claim against Joseph for attorney fees he earned during their marriage, which were converted into annuity contracts. Hilary claimed a right to half of these annuities in the divorce action, but Joseph maintained they were separate property. At trial, Joseph testified that 20% of the annuity payments were likely community property because the annuity contracts were purchased during the marriage, although the work was done prior to the marriage. This resulted in a community property allocation of $6,000 per month in fixed payments that would continue until Joseph's death. Based on Joseph's life expectancy, he estimated that Hilary's claim related to the annuity contracts totaled $600,000.

Finally, Joseph had a potential claim in the amount of $2.138 million for reimbursement under California Family Code section 2640. This claim was based on the theory that proceeds from the sale of a home owned by Joseph as separate property (the "Perugia House") could be traced to the acquisition of another property (the "Mapleton Drive Property") during Joseph's and Hilary's

2

marriage. This claim was initially asserted during settlement negotiations between Joseph and Hilary, and the record indicates that the last mention of this claim was in April 2008. Bagby, while representing Joseph, identified "tracing issues" with this claim. These "tracing issues" stemmed from the proceeds from the sale of the Perugia House being commingled with approximately $4.8 million in income in a joint bank account.

2. *Bagby's $5 million judgment against Joseph.*

In 2013, Bagby was seriously injured in a motorcycle accident. Bagby retained Joseph, who was a personal injury attorney, to represent Bagby in a California lawsuit to recover for his injuries. Bagby's suit was unsuccessful and Bagby perceived the lack of success as being due to Joseph's malpractice. In May 2017, Bagby sued Joseph in California for legal malpractice. Joseph failed to answer the complaint and his default was entered in August 2017. In September 2018, a default judgment in the amount of $27,146,021.41 was entered against Joseph. In February 2020, following an appeal, the default judgment was reduced to $5 million.

3. *The Ketchum House transfer.*

In 2004, after their separation but prior to their divorce, Joseph and Hilary purchased a home together in Ketchum, Idaho (the "Ketchum House"). The record shows that they each owned a one-half interest in the Ketchum House as tenants in common. Both Joseph and Hilary testified that in 2016, they discussed an agreement whereby Joseph would transfer his interest in the Ketchum House to Hilary in satisfaction of her claims against him for attorney fees he earned during their marriage. Two years later, in December 2018 (about three months after the default judgment was entered), Joseph and Hilary met in Ketchum, Idaho, where they executed a quitclaim deed and a warranty deed conveying Joseph's one-half interest in the Ketchum House to Hilary.

Joseph testified at the trial that he was looking forward to retiring, wanted to limit his exposure to expenses associated with the Ketchum House, and wanted to resolve Hilary's claim for the attorney fees earned during their marriage. Hilary, a real estate agent, valued the Ketchum House at between $2.3 and $2.4 million, which was near the $2,132,327 assessed value of the property in 2018. The Ketchum House transfer occurred approximately three months after Bagby obtained his initial default judgment against Joseph. Bagby did not record an abstract of any judgment, lien, or encumbrance based on the judgment in his legal malpractice action against the title to the Ketchum House before it was transferred to Hilary.

### 4. *Joseph's actions following Bagby's lawsuit.*

At the time of the Ketchum House transfer in December 2018, Joseph owned assets with an estimated value of between $5 and $10 million. Approximately $6 million in earned attorney fees were deposited into accounts at City National Bank during 2018. In June 2019, Joseph appeared for a debtor's examination in Los Angeles, California. Joseph closed his bank accounts at City National Bank about a month prior to the debtor's examination. Joseph then opened a new bank account following the debtor's examination.

Between September 2018 and June 2019, Joseph prepaid several expenses. These expenses included a year of lease payments for his office space, a year of lease payments on his automobile, and a year's worth of dues to multiple country clubs in which Joseph was a member.

In May 2019, Joseph invested $3.5 million in a Nevis Island limited liability company called, "Blue Globe Finance." Joseph testified that Blue Globe is a hedge fund. Joseph was asked whether he was aware if Blue Globe was a haven for debtors, and Joseph responded no. Joseph testified that he learned about Blue Globe at an investment seminar.

In the first half of 2020, Joseph transferred the title to a 2003 Range Rover located in Idaho to Hilary. Joseph testified that he transferred the Range Rover to Hilary because he was no longer going to be in Idaho. The value of the Range Rover was not established.

In June 2020, Joseph moved to Florida. He testified that he decided to move to Florida after Bagby's attorney told him that Bagby was going to foreclose on his California home and that Joseph should find a new place to live. Joseph then stated that he had family in Florida, and it made sense to move there for that reason. Hilary testified that Joseph told her that, by moving to Florida, the contingent fee annuities would be exempt from execution. Joseph denied having told Hilary that he would obtain an exemption from execution on the annuities by moving to Florida.

## B. Procedural background.

In May 2019, Bagby sued Joseph and Hilary in Idaho, asserting claims for actual and constructive fraudulent transfer under California's Uniform Voidable Transactions Act ("UVTA"). Bagby alleged that the transfer of the Ketchum House was intended to hinder, delay, or defraud Bagby in his attempt to collect on the $5 million judgment. Joseph and Hilary generally denied the allegations, and they asserted an affirmative defense under the UVTA that Hilary was a good faith purchaser for value. The affirmative defense was based on their assertion that Joseph transferred the Ketchum House to Hilary in satisfaction of her claims against him in the dissolution

4

action for her share of attorney fees he earned prior to their separation. The parties agreed to apply California substantive law to the claims and affirmative defense. A court trial was held in the matter at which only three witnesses testified: Joseph, Hilary, and Bagby. Other than having local counsel question him when he called himself as a witness, Bagby represented himself at trial.

In its written findings and conclusions, the district court found Joseph and Hilary to be credible witnesses. The district court also found that Hilary provided consistent testimony that had not been impeached. And the district court found that Joseph was credible on the key issues in the case. Although Bagby cross-examined Joseph at length attempting to impeach Joseph's testimony, the district court found that these attempts did not rise to the level of impeaching Joseph on the material issues being tried.

On Bagby's first claim for actual intent to hinder, delay, or defraud, the district court analyzed each of the "badges of fraud" that arise under the relevant section of California's UVTA. *See* Cal. Civ. Code § 3439.04(a)(1). The district court found that some badges of fraud weighed for and some against a finding of actual intent, but ultimately concluded that Bagby had not met his burden of proving actual intent to hinder, delay, or defraud.

On Bagby's second claim for constructive fraud under the UVTA, which required proof that a transfer was made without reasonably equivalent value between the parties, the district court found that the Ketchum House transfer was for reasonably equivalent value. Specifically, the district court concluded that Joseph's one-half interest in the Ketchum House, valued at between $1.15 and $1.2 million, was reasonably equivalent to Hilary's claims for attorney fees earned by Joseph prior to separation ($1.277 million in fees and $600,000 in Hilary's share of the annuities). Because of this, the district court concluded Bagby had not met his burden.

On Bagby's third claim, which required proof of the absence of reasonably equivalent value and the insolvency of the transferor, the district court found that Bagby had met his burden of establishing that Joseph was insolvent at the time the Ketchum House was transferred. However, for the same reasons it discussed on the second claim, the court concluded Bagby had not established a lack of reasonably equivalent value.

Finally, on the affirmative defense, the district court found that Hilary acted in good faith and that the parties received reasonably equivalent value for the Ketchum House transfer. The district court found that Hilary did not learn of Bagby's judgment against Joseph until after the transfer.

Based on the foregoing findings, the district court concluded that Bagby failed to establish a right to recover under any of his claims and entered judgment in favor of Joseph and Hilary and dismissed Bagby's claims. After trial, Bagby moved the district court to reconsider, to amend the findings of fact and judgment, and for a new trial (collectively, "post-trial motions"). The district court denied Bagby's motions to reconsider and for a new trial. The district court granted Bagby's motion to amend four of its findings of fact, none of which altered its conclusions regarding Bagby's claims. Bagby timely appealed.

## II. ISSUES ON APPEAL

1. Did the district court abuse its discretion when it declined to adopt an adverse inference due to evidence not produced or destroyed by Joseph and Hilary?

2. Are the district court's findings of fact supported by substantial and competent evidence, and do its conclusions of law follow therefrom?

3. Are Joseph and Hilary entitled to attorney fees on appeal?

## III. STANDARD OF REVIEW

"Review of a trial court's conclusions following a [court] trial is limited to ascertaining whether the evidence supports the findings of fact, and whether the findings of fact support the conclusions of law." *McCarthy Corp. v. Stark Inv. Grp., LLC*, 168 Idaho 893, 902, 489 P.3d 804, 813 (2021) (quoting *Caldwell Land & Cattle, LLC v. Johnson Thermal Sys., Inc.*, 165 Idaho 787, 795, 452 P.3d 809, 817 (2019)). "It is in the province of the district judge acting as trier of fact to weigh conflicting evidence and testimony and to judge the credibility of the witnesses." *Cook v. Van Orden*, 170 Idaho 46, 57, 507 P.3d 119, 130 (2022) (quoting *Clayson v. Zebe*, 153 Idaho 228, 232, 280 P.3d 731, 735 (2012)). "This Court will not set aside a trial court's findings of fact unless the findings are clearly erroneous." *McCarthy Corp.*, 168 Idaho at 902, 489 P.3d at 813 (citation omitted). Clear error does not "exist if the findings are supported by substantial and competent, though conflicting, evidence." *State, Dep't of Health & Welfare v. Roe*, 139 Idaho 18, 21, 72 P.3d 858, 861 (2003). "Evidence is regarded as substantial if a reasonable trier of fact would accept it and rely upon it in determining whether a disputed point of fact had been proven." *Kenworth Sales Co. v. Skinner Trucking, Inc.*, 165 Idaho 938, 942, 454 P.3d 580, 584 (2019) (quoting *Turcott v. Estate of Bates*, 165 Idaho 183, 188, 443 P.3d 197, 202 (2019)).

This Court exercises "free review over the trial court's conclusions of law to determine whether the trial court correctly stated the applicable law and whether its legal conclusions are

sustained by the facts found." *Burns Concrete, Inc. v. Teton County*, 168 Idaho 442, 451, 483 P.3d 985, 994 (2020) (citing *Kunz v. Nield, Inc.*, 162 Idaho 432, 438, 398 P.3d 165, 171 (2017)).

## IV.    ANALYSIS

### A.  The district court did not abuse its discretion by declining to draw an adverse inference from documents not produced or destroyed.

Bagby initially argues that the district court should have viewed evidence produced by Joseph and Hilary with distrust because the evidence admitted at trial showed that they either failed to produce or destroyed relevant documents. Bagby essentially argues that the court should have drawn an inference that the documents that were not produced or destroyed were damaging to Joseph's and Hilary's case. Bagby relies on both California and Idaho authority to support these arguments. Given that Bagby has cited both California and Idaho authority on this claim, it is first necessary to determine whether Idaho or California law applies to Bagby's argument.

"Even where a court is applying the laws of another state, the procedural law of the forum court will still apply." *Carroll v. MBNA Am. Bank*, 148 Idaho 261, 267, 220 P.3d 1080, 1086 (2009) (citing *Houston v. Whittier*, 147 Idaho 900, 911–12, 216 P.3d 1272, 1283–84 (2009)). "[P]rocedural matters to which forum law will be applied include forms of action, pleading and conduct of proceedings before the court, allocation of burdens of proof, and admissibility and sufficiency of evidence." *Id.* (citing Restatement (Second) of Conflict of Laws §§ 124, 127, 133–35, 138 (1971)).

We hold that Idaho law applies to Bagby's argument that he was entitled to an adverse inference due to the destruction or failure to produce documents. Bagby is essentially advocating for a spoliation inference. He argues, primarily citing California law, that the district court should have viewed the evidence that Joseph and Hilary did produce with distrust because they had access to additional evidence that had either been destroyed or was not produced by Joseph and Hilary. "The spoliation doctrine is a general principle of civil litigation which provides that upon a showing of intentional destruction of evidence by an opposing party, an inference arises that the missing evidence was adverse to the party's position." *Courtney v. Big O Tires, Inc.*, 139 Idaho 821, 824, 87 P.3d 930, 933 (2003) (citation omitted). The spoliation doctrine thus applies to the conduct of proceedings before the trial court. As a result, Idaho law applies. *See Carroll*, 148 Idaho at 267, 220 P.3d at 1086.

We now turn to the question of whether the district court abused its discretion in declining to adopt an adverse inference. The trial court exercises its discretion when determining whether to

apply the spoliation doctrine to a given situation. *Bromley v. Garey*, 132 Idaho 807, 812, 979 P.2d 1165, 1170 (1999). In determining whether a court has abused its discretion, this Court asks "[w]hether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018) (citation omitted).

The district court addressed Bagby's spoliation argument in its oral findings of fact and conclusions of law. The district court recognized that all the parties to this case had either destroyed or failed to produce documents. The district court noted that Hilary testified that she shredded some older documents, but retained the ones she thought were important. Bagby admitted he had destroyed documents pursuant to a document retention policy, although the parties stipulated that no inference could be drawn from this destruction. Finally, the district court stated that, "for [Joseph], I don't think there's any evidence necessarily in the record about his destruction of evidence, however, there are certainly inferences in arguments and questions were asked of [Joseph] about why he didn't have certain documents." Ultimately, the district court declined to draw an adverse inference, stating that Joseph's and Hilary's divorce "has drug [sic] on for some time. The parties have been separated for over – about 20 years now. It has drug [sic] on, and it doesn't surprise the Court that the parties have not been able to produce all the records as requested."

The district court did not err in declining to draw an adverse inference against Joseph or Hilary. The district court perceived the issue as one of discretion, acted within the outer bounds of its discretion, and acted consistently with the applicable legal standard. Further, the district court also reached its decision by an exercise of reason because, after analyzing the evidence, it determined that it was to be expected that the parties would not keep every document over the course of a nearly 20-year divorce case. Accordingly, the district court did not abuse its discretion in declining to adopt an adverse inference.

## B. The district court's findings of fact on the affirmative defense are supported by substantial and competent evidence and its legal conclusions follow from those findings of fact.

Bagby asserted three different claims under California's UVTA that were addressed at trial, and Joseph and Hilary asserted one affirmative defense under the same act. The thrust of Bagby's argument on appeal is that many of the district court's factual findings are clearly erroneous. In

light of the erroneous factual findings, Bagby argues the district court erred in dismissing his UVTA claims against Joseph and Hilary. We need not address Bagby's claims of error because the district court correctly concluded that Joseph and Hilary prevailed on their affirmative defense.

1. *California's UVTA.*

California, like many states, has adopted a version of the Uniform Voidable Transactions Act, which allows a creditor to set aside a debtor's transfer of property under certain circumstances. *See* Cal. Civ. Code §§ 3439–3439.14. "The purpose of the UVTA is to prevent debtors from placing, beyond the reach of creditors, property that should be made available to satisfy a debt." *Chen v. Berenjian*, 245 Cal. Rptr. 3d 378, 382 (Cal. Ct. App. 2019) (citation omitted). "The UVTA applies on its face to all transfers." *Id.* (citation omitted). A creditor who successfully demonstrates either actual or constructive fraud may obtain a remedy such as avoidance of the transfer. Cal. Civ. Code § 3439.07(a). The present appeal involves three causes of action that arise under the UVTA. *See* Cal. Civ. Code §§ 3439.04(a)(1) and (a)(2), 3439.05(a).

Bagby's first cause of action is an actual fraud claim. California Civil Code section 3439.04(a)(1) allows a creditor to set aside a transfer that was made with "actual intent to hinder, delay, or defraud" the creditor. *See Universal Home Improvement, Inc. v. Robertson*, 264 Cal. Rptr. 3d 686, 689–90 (Cal. Ct. App. 2020). To determine whether a creditor has proven a claim for actual fraud, California courts consider eleven non-exhaustive factors often referred to as the "badges of fraud." *Id.* at 690 (citation omitted).

The UVTA provides an affirmative defense to an actual fraud claim when the transferee (1) took in good faith and (2) for reasonably equivalent value:

> A transfer or obligation is not voidable under paragraph (1) of subdivision (a) of Section 3439.04, against a person that took in good faith and for a reasonably equivalent value given the debtor or against any subsequent transferee or obligee.

Cal. Civ. Code § 3439.08(a). The party asserting this affirmative defense has the burden of proving good faith and reasonably equivalent value by a preponderance of the evidence. Cal. Civ. Code § 3439.08(f)(1), (g).

The second cause of action is a constructive fraud claim. *See* Cal. Civ. Code §§ 3439.04(a)(2), 3439.05(a). California Civil Code section 3439.04(a)(2) states:

> (a) A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:

9

. . .

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:

(A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

(B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

The third cause of action is a different type of constructive fraud claim. California Civil Code section 3439.05(a) requires a showing that (1) the transfer was made without receiving a reasonably equivalent value and (2) the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer:

A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Cal. Civ. Code § 3439.05(a).

Critical here, each of the constructive fraud claims arising under the UVTA share a common element: that the debtor or transferee must receive "reasonably equivalent value" under the transaction. *See Annod Corp. v. Hamilton & Samuels*, 123 Cal. Rptr. 2d 924, 929–30 (Cal. Ct. App. 2002). Thus, under the UVTA's constructive fraud provisions, "[i]f the debtor received reasonably equivalent value, the inquiry ends there." *Id.* at 930. Whether a transfer is made with actual intent, whether a transferee acted in good faith, and whether there was reasonably equivalent value are questions of fact. *Nautilus, Inc. v. Yang*, 217 Cal. Rptr. 3d 458, 463 (Cal. Ct. App. 2017) (citing *Annod Corp.*, 123 Cal. Rptr. 2d at 929); *Aghaian v. Minassian*, 273 Cal. Rptr. 3d 561, 567 (Cal. Ct. App. 2020) (citations omitted). A creditor seeking to void a transaction under the UVTA's constructive fraud provisions has the burden of proving actual or constructive fraud by a preponderance of the evidence. Cal. Civ. Code § 3439.04(c).

Given the UVTA's framework, a showing of good faith and reasonably equivalent value—the elements of the affirmative defense—defeats a creditor's claims for actual or constructive fraud. *See Annod Corp.*, 123 Cal. Rptr. 2d at 929–30 (explaining that the affirmative defense, if proven, is dispositive of actual and constructive fraud claims under the UVTA). Therefore, we first

examine whether the district court erred in concluding that Hilary had proven the affirmative defense set out in section 3439.08. If the district court correctly reached this conclusion, then it correctly dismissed all of Bagby's claims in this case.

    2. *Notwithstanding the conflicting evidence, the district court's finding that Hilary acted in good faith is supported by substantial and competent evidence.*

Bagby asserts that the district court's finding that Hilary acted in good faith is not supported by substantial and competent evidence. He argues that the evidence shows Hilary knew that Bagby had sued Joseph for malpractice before the transfer of the Ketchum House, which shows Hilary was not acting in good faith. He also asserts that Hilary knew Joseph did not owe her any unpaid attorney fees earned during the marriage, although Bagby does not cite to the record to support this assertion.

Joseph and Hilary argue the district court properly concluded Hilary acted in good faith. They argue that the critical issue regarding Hilary's intent was her lack of knowledge of the judgment at the time of the Ketchum House transfer, rather than her knowledge of the lawsuit. Joseph and Hilary also argue that Bagby relies on speculation rather than evidence adduced at trial to support his argument regarding Hilary's good faith.

The district court found Hilary to be a credible witness and was persuaded by Hilary's testimony that she was unaware of Bagby's judgment entered against Joseph at the time of the Ketchum House transfer. Relying principally on its finding that Hilary lacked any knowledge of the judgment against Joseph at the time of the transfer, the district court found that Hilary acted in good faith.

"'[G]ood faith' means that the transferee acted without actual fraudulent intent and that he or she did not collude with the debtor or otherwise actively participate in the fraudulent scheme of the debtor." *Nautilus, Inc.*, 217 Cal. Rptr. 3d at 464 (quoting Cal. Civ. Code § 3439.08, Legis. Comm. Cmt. 1 (West 2016)). Further, "[t]he transferee's knowledge of the transferor's fraudulent intent may, in combination with other facts, be relevant on the issue of the transferee's good faith[.]" *Id.*

Here, Hilary testified that she was unaware of the judgment against Joseph at the time of the transfer of the Ketchum House in December 2018. She also testified that she did not learn of the judgment until she had been served a subpoena in April 2019—several months after the transfer. After receiving the subpoena, she learned from Joseph that Bagby had obtained a judgment against him. Hilary also testified that she and Joseph first spoke in 2016 about

11

transferring his interest in the Ketchum House to her in order to resolve her claim for attorney fees, which predated Bagby's lawsuit.

The district court's finding that Hilary acted in good faith is supported by substantial and competent evidence. "Evidence is regarded as substantial if a reasonable trier of fact would accept it and rely upon it in determining whether a disputed point of fact had been proven." *Kenworth Sales Co.*, 165 Idaho at 942, 454 P.3d at 584 (quoting *Turcott*, 165 Idaho at 188, 443 P.3d at 202). A reasonable trier of fact could rely on Hilary's testimony to conclude that she acted in good faith by accepting Joseph's one-half interest in the Ketchum House in lieu of the attorney fees Joseph owed her in the divorce action. The district court found it significant that both Joseph and Hilary testified that they spoke about transferring the Ketchum House in 2016, which was before Bagby filed his lawsuit against Joseph. The district court also found that Hilary was credible and had not been impeached. Although it is true that Hilary knew about Bagby's lawsuit prior to the Ketchum House transfer, this evidence did not preclude the district court from relying on other evidence of Hilary's intent. *See, e.g., Roe*, 139 Idaho at 21, 72 P.3d at 861 ("[C]lear error will not be deemed to exist if the findings are supported by substantial and competent, though conflicting, evidence."). The district court was able to observe Hilary first-hand and, unlike this Court, had the benefit of perceiving her demeanor, tone, and affect. Therefore, we will not second-guess the district court's credibility determination. Accordingly, we conclude that the district court did not err in finding that Hilary was not aware of Bagby's judgment prior to the Ketchum House transfer and that she, therefore, acted in good faith.

Bagby also asserts that the district court erred because the evidence demonstrated that Hilary "knew Joseph did not owe Hilary any amount as of December 27, 2018, as they both knew they had not yet executed any agreement which would have created a legal obligation for Joseph to make any payments to Hilary." Bagby does not refer to any evidence in the record to support this assertion. Rather, the record reveals that Hilary testified that she believed she had claims against Joseph for reimbursement of attorney fees he collected during their marriage. The testimony shows that, at the time of the Ketchum House transfer, Hilary believed that Joseph owed her a minimum of $1.275 million. Although Bagby argues that Joseph was not legally obligated to pay Hilary for the attorney fees earned during marriage, the record demonstrates that Hilary had a good faith belief that she was owed the amounts she claimed. Therefore, we are unpersuaded by

Bagby's argument that Hilary was acting in bad faith because she knew Joseph did not owe her money for the attorney fees.

3. *The district court's finding that the transfer of the Ketchum House provided reasonably equivalent value is supported by substantial and competent evidence.*

Bagby asserts that the evidence at trial was not sufficient to allow the district court to find that Hilary had a claim against Joseph of reasonably equivalent value to his one-half interest in the Ketchum House. Bagby argues that California Family Code section 2550 required any settlement between Joseph and Hilary to be in writing, which he argues did not occur here. Bagby also asserts that the district court erred in finding that Joseph's $2.138 million reimbursement claim was not viable.

Joseph and Hilary assert the district court's conclusion on reasonably equivalent value was supported by substantial and competent evidence. They also argue that Bagby's reliance on California Family Code section 2550 is inapt because that provision does not apply outside a divorce proceeding. Joseph and Hilary next maintain that the district court properly concluded the $2.138 million reimbursement claim was not viable because Bagby recognized tracing issues himself when he represented Joseph in the dissolution action.

The district court concluded that the Ketchum House transfer provided reasonably equivalent value. The district court found that Hilary's claim for attorney fees valued at between $1.277 and $1.877 million was reasonably equivalent to the $1.15 to $1.2 million value of Joseph's share of the Ketchum House. The district court found that California Family Code section 2550 did not require a written agreement for the transfer between Joseph and Hilary to provide reasonably equivalent value because that statute only applies in a divorce proceeding. As for Joseph's $2.138 million reimbursement claim, the district court concluded that this claim was an early pre-litigation settlement offer that Joseph eventually and reasonably abandoned.

As previously stated, the elements of constructive fraud and the affirmative defense available under California's version of the UVTA all require a showing of reasonably equivalent value. *See* Cal. Civ. Code §§ 3439.04(a)(2), 3439.05(a), 3439.08(a). California Civil Code section 3439.03 provides that "[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied[.]" California's UVTA defines "debt" as "liability on a claim." Cal. Civ. Code § 3439.01(d). "Claim" is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or

unsecured." Cal. Civ. Code § 3439.01(b). Further, a "creditor" is "a person that has a claim[.]" Cal. Civ. Code § 3439.01(c).

Applying these code provisions to this case, we hold that the district court's finding that the Ketchum House was transferred for reasonably equivalent value is supported by substantial and competent evidence. The district court found two claims by Hilary that were relevant to its determination of reasonably equivalent value: (1) the claim in the amount of $1.277 million for Hilary's share of attorney fees earned during the marriage, and (2) Hilary's claim for her $600,000 portion of Joseph's annuities, which were funded from attorney fees earned prior to their separation. Joseph and Hilary produced two exhibits at trial showing the breakdown of contingency fee cases Joseph earned prior to his and Hilary's separation, totaling $1.277 million. Joseph also testified that he calculated the $1.277 million in attorney fees by estimating the percentage of time worked on each case prior to his and Hilary's separation to estimate Hilary's share of the fees.

In a similar vein, Joseph testified that the two cases that settled during his and Hilary's marriage resulted in annuities for which he received payments of $30,000 per month. Joseph testified that it was his understanding that Hilary had claimed a right to one-half of the annuity income in the divorce action. The district court found that Joseph's estimation of time spent on each case along with the supporting documentation in the record was sufficient. Further, documents in the record reveal that Bagby himself, while he was representing Joseph, identified claims that Hilary had for contingency fees Joseph earned during the marriage.

In light of the evidence discussed above, the district court's findings on the amount of Hilary's claim for attorney fees were not clearly erroneous. The district court found that Hilary had a $1.277 million claim for her share of attorney fees for successful contingency fee cases and a $600,000 claim from the annuities and that these claims were satisfied in exchange for Joseph's $1.15 to $1.2 million one-half interest in the Ketchum House. The district court's conclusion that each party received reasonably equivalent value follows from these findings.

Bagby challenges several aspects of the district court's finding regarding Hilary's claim for attorney fees, despite the evidence discussed above. He argues that Joseph's estimation of the attorney fees owed to Hilary did not include deductions for taxes and expenses for unsuccessful contingency fee cases. Bagby argues that failing to consider these deductions shows the district court's valuation of Hilary's claim was seriously flawed. The district court directly addressed

Bagby's argument on this point, finding that "Bagby did not present any evidence establishing an appropriate reduction [to the attorney fees owed to Hilary]." The district court stated that it relied on the evidence in the record:

> Ultimately, what may or may not be the correct Amount [for attorney fees], we don't have an expert accountant to sit up there and tell the Court, you know, this is the appropriate way to account for these thirteen cases, how to deduct taxes, whether you deduct taxes, whether you deduct expenses, whether Ms. Davis should have been -- had expenses for nonsuccessful [sic] claims deducted from these total amounts, whether she should have recovered on expenses that were recovered in the successful cases. There's no accountant here to provide any information to the Court about what the appropriate way to calculate these fees is and, therefore, the only number before this Court is the $1.277 million that the Court can consider.

The record supports the district court's finding that, although Joseph may have been entitled to deductions, evidence of the amount that should have been deducted was not presented. The district court's findings on this issue are supported by substantial and competent evidence.

Bagby also takes issue with the district court's finding that Joseph's potential reimbursement claim for $2.138 million was an early, pre-litigation settlement offer that Joseph reasonably abandoned. Bagby asserts the district court should not have allowed Joseph to abandon this claim for reimbursement because it eliminated any offset Joseph had against Hilary's claims and made her a creditor of Joseph.

The district court concluded that any claim Joseph had for reimbursement was not borne out by the record. Joseph testified that a home he owned as separate property, the Perugia House, had been sold in 2000. Joseph also testified that $2.138 million from the sale of the Perugia House was then deposited into a joint bank account along with approximately $4.8 million in income from the year 2000. Bagby, while representing Joseph, identified "tracing issues" with this claim. The district court ultimately found that Joseph's potential claim for reimbursement was not supported by the evidence presented at trial:

> I do have to say that the testimony of both [Hilary] and [Joseph] is consistent when I look at their testimony as it relates to the $2.138 million reimbursement claim. Both of them are saying that [Joseph] was not seeking reimbursement of the $2.138 million. Both are saying [Hilary] never asked for reimbursement by [Joseph]. So that's -- the Court finds that that's unrebutted testimony. The evidence also shows, as I mentioned earlier, that the $2.138 million was placed into a joint account along with approximately $4.8 million of income in 2000, thereby commingling any separate property that [Joseph] would be entitled to receive with community income. Really, at the end of the day, the Court is left with one request for the $2.138 million and that was back in 2004 when [Bagby] was representing [Joseph],

15

and that's found in the letters shown as Exhibits 37, 39, and 42. Of course, Exhibit 42 is later, but in that particular letter [Bagby] states in Exhibit 42 that [Joseph] has tracing issues involving the $2.138 million, so there is a recognition that there may be some difficulty proving it. And, of course, the parties are not asking for it now and the $2.138 million request was last brought up by [Bagby].

The district court did not err in rejecting Bagby's argument on this point. Although the record reveals that Bagby—in a letter to Hilary's counsel during the divorce settlement negotiations in 2004—identified a potential $2.138 million reimbursement claim, the record also reveals that there were tracing issues with this claim. Bagby acknowledged the tracing issues in a letter to Joseph. Joseph and Hilary also testified that the $2.138 million was placed in a joint bank account along with community funds. While there was conflicting evidence presented at trial, the district court's finding that the $2.138 million reimbursement claim was not a viable claim is supported by substantial and competent evidence. *See Roe*, 139 Idaho at 21, 72 P.3d at 861.

Finally, Bagby argues that before Joseph and Hilary could resolve Hilary's claims with the transfer of the Ketchum House, California Family Code section 2550 required Joseph and Hilary to make a written agreement settling their divorce claims or make an oral stipulation in open court concerning the resolution. Because there had been no such agreement, Bagby asserts Joseph did not owe Hilary anything on the date of the transfer.

California Family Code section 2550 requires a district court to divide community property evenly absent a written agreement or oral stipulation in court from the parties:

> Except upon the written agreement of the parties, or on oral stipulation of the parties in open court, or as otherwise provided in this division, in a proceeding for dissolution of marriage or for legal separation of the parties, the court shall, either in its judgment of dissolution of the marriage, in its judgment of legal separation of the parties, or at a later time if it expressly reserves jurisdiction to make such a property division, divide the community estate of the parties equally.

"The requirement of section 2550 that an agreement either be written or orally stated in open court is strictly construed." *In re Marriage of Huntley*, 216 Cal. Rptr. 3d 904, 910 (Cal. Ct. App. 2017) (citing *In re Marriage of Dellaria & Blickman-Dellaria*, 90 Cal. Rptr. 3d 802 (Cal. Ct. App. 2009)). Thus, a division of marital property in an action between former spouses for dissolution or separation must be in writing or stipulated to in open court to be enforceable. *Id.*

The crux of Bagby's argument on this point is that Hilary's "claim" for attorney fees could not have truly been a claim until the parties entered into a written agreement or provided an oral stipulation. However, California Civil Code section 3439.03 provides that "value" is given when

an "antecedent debt" is satisfied. Section 3439.01(d) defines "debt" as "liability on a claim." And section 3439.01(b) defines "claim" as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." The broad definition of "claim" in the UVTA does not require that Hilary's claim be reduced to writing to establish reasonably equivalent value. Moreover, California Family Code section 2250 expressly applies to legal actions for dissolution or separation, not claims pursuant to the UVTA. The district court did not err in finding that satisfaction of Hilary's claim for contingency fees could provide reasonably equivalent value, regardless of the requirements set out in California Family Code section 2550.

Based on the foregoing, we hold that the district court's findings that Hilary acted in good faith and that the transfer of the Ketchum House provided reasonably equivalent value were supported by substantial and competent evidence. Thus, the district court's conclusion that Hilary had met her burden of establishing the affirmative defense set out in California Civil Code section 3439.08 is affirmed. Because this affirmative defense precludes a claim for actual fraud under California Civil Code section 3439.04(a)(1), we need not address whether the district court erred in dismissing Bagby's claim for actual fraud. Likewise, because the district court did not err in finding reasonably equivalent value, we need not address Bagby's constructive fraud claims.

## C. Joseph and Hilary are not entitled to attorney fees on appeal.

Joseph and Hilary assert they are entitled to attorney fees on appeal pursuant to Idaho Code section 12-121. Bagby does not seek attorney fees on appeal. Instead, he argues that Joseph and Hilary should not be awarded attorney fees because his position on appeal was taken in good faith based on the facts and applicable law.

Initially, we must determine what law applies to Joseph's and Hilary's claim for attorney fees. "If the award of attorney fees is a discretionary matter governed by statute, then it is considered to be procedural, requiring application of the forum law." *Carroll*, 148 Idaho at 270, 220 P.3d at 1089 (citing *Houston*, 147 Idaho at 911, 216 P.3d at 1283). An award of attorney fees under Idaho Code section 12-121 is discretionary. *Michalk v. Michalk*, 148 Idaho 224, 235, 220 P.3d 580, 591 (2009) (citation omitted). We thus conclude that Idaho law applies to Joseph's and Hilary's claims for attorney fees on appeal.

Idaho Code section 12-121 states that attorney fees may be awarded to the prevailing party when "the case was brought, pursued or defended frivolously, unreasonably or without

17

foundation." "Generally, an appeal is considered frivolous where it disputes the trial court's factual findings and simply asks the Court to reweigh the evidence." *In re Doe II*, 166 Idaho 47, 57, 454 P.3d 1130, 1140 (2019) (citing *In re Doe*, 164 Idaho 511, 518, 432 P.3d 60, 67 (2018)).

Although we have concluded that the district court did not err, we cannot conclude that Bagby brought this appeal frivolously, unreasonably or without foundation. Bagby presented valid arguments concerning the application of California law and the district court's factual findings.

## V.  CONCLUSION

The district court's findings that Hilary acted in good faith, and that the Ketchum House transfer provided reasonably equivalent value, are supported by substantial and competent evidence. As a result, the district court did not err in concluding that Hilary established the affirmative defense set out in California Civil Code section 3439.08. Accordingly, we affirm the district court's judgment dismissing Bagby's claims. As the prevailing parties, Joseph and Hilary are awarded their costs on appeal pursuant to Idaho Appellate Rule 40; however, we decline to award them attorney fees on appeal.

Chief Justice BEVAN, and Justices BRODY, STEGNER, and MOELLER CONCUR.